UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRADLEY A. WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:15-cv-0895-SEB-DML |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social Security, | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

# Report and Recommendation on
## Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C.

§ 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition.  (Dkt. 9)  As addressed below, the Magistrate Judge

recommends that the District Judge REVERSE AND REMAND the decision of the

Commissioner of the Social Security Administration that plaintiff Bradley A.

Wright is not disabled.

## Introduction

Mr. Wright applied in January 2012 for Disability Insurance Benefits (DIB)

and Supplemental Security Income disability benefits (SSI) under Titles II and

XVI, respectively, of the Social Security Act, alleging that he has been disabled

since July 1, 2007.  Acting for the Commissioner of the Social Security

Administration after a hearing on August 28, 2013, administrative law judge Mark

C. Ziercher issued a decision on December 12, 2013, finding that Mr. Wright is not

disabled.  The Appeals Council denied review of the ALJ's decision on April 8,

2015, rendering the ALJ's decision for the Commissioner final.  Mr. Wright timely

filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's

decision.

Mr. Wright contends the ALJ erred by (1) failing to evaluate properly the

opinions of his treating psychiatrist and his mental health counselor, (2) failing to

rationally support the adverse credibility determination, and (3) failing to account

properly in the RFC for his moderate difficulties with concentration, persistence, or

pace.  The court agrees with all three contentions.

## Standard for Proving Disability

To prove disability, a claimant must show he is unable to "engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. § 423(d)(1)(A) (DIB benefits);  42 U.S.C. § 1382c(a)(3)(A) (SSI benefits).[1]  Mr.

Wright is disabled if his impairments are of such severity that he is not able to

perform the work he previously engaged in and, if based on his age, education, and

---

[1]    Two programs of disability benefits are available under the Social Security
Act:  DIB under Title II for persons who have achieved insured status through
employment and withheld premiums, 42 U.S.C. § 423 *et seq.*, and SSI disability
benefits under Title XVI for uninsured individuals who meet income and resources
criteria, 42 U.S.C. § 1381 *et seq.*  The court's citations to the Social Security Act and
regulations promulgated by the Social Security Administration are those applicable
to DIB benefits.  For SSI benefits, material identical provisions appear in Title XVI
and generally at 20 C.F.R. § 416.901 *et seq.*

2

work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy.  42 U.S.C. § 423(d)(2)(A).  The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if he is, then he is not disabled.  Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits.  *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity (RFC) is determined for purposes of steps four and five.  RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the

fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled.  The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on his vocational profile (age, work experience, and education) and his RFC; if so, then he is not disabled.

The individual claiming disability bears the burden of proof at steps one through four.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987).  If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity.  20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential.  A court must affirm if no error of law occurred and if the findings are supported by substantial evidence.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion.  *Id.*  The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence.  *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability.  *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).  The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the

conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions.  *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

Mr. Wright contends that the ALJ's decision he can work despite the limiting effects of his mental impairments is not supported by substantial evidence. He attacks specifically the ALJ's evaluation of medical opinions, the adverse credibility determination, and the lack of an accommodation in the RFC for the moderate difficulties with concentration, persistence, or pace credited by the ALJ. The court will first describe Mr. Wright's work history and his medical history before addressing the alleged errors in the ALJ's analysis.

## I.   Mr. Wright asserts that symptoms and limitations from depression and anxiety prevent him from working.

### A.  Mr. Wright's Work History

Mr. Wright was born in 1966, and was 40 years old at the alleged onset of his disability in July 2007.  He was 47 years old at the time of the ALJ's decision denying disability benefits.  He has worked in a variety of positions, including restaurant server and restaurant manager, car salesman, and quality inspector of compact discs at a Sony factory.  His alleged onset date coincides with his cessation of work.  Mr. Wright testified he has suffered from depression and anxiety nearly his entire life, and he has worked over his adult life but with much stopping and starting.  When severe depression symptoms set in, he tended to quit his job; after a month or two, he was able to work again for a time until he felt too depressed,

anxious, and overwhelmed to continue. (R. 55, 66, 68). In response to the ALJ's

question about how he was able to work in 2007 and just before then, he said:

> Question by ALJ: So when you were working in 2007, and even just
> before that, were you still feeling overwhelmed just as easily?
>
> Answer: I was – I just as easily overwhelmed. But I seemed like I
> could – I could put it in the proper perspective. That, you know, it is
> what it is. This is what you – this is what you've been dealt. . . . And
> you have – you have to be stronger than that. And then one day, I
> just I couldn't be stronger anymore. And I kept thinking that if I only,
> you know, if it's a month off, if it's two months off, if it's a year off.
> You know that I'm going to – there's going to be a time that I'm going
> to feel stronger. And it doesn't come.

(R. 75-76).

Mr. Wright waited until January 2012 to apply for disability benefits,

though he had stopped working over five years before. He had financial resources

to take care of himself and he "exhausted them first thinking that it would get

better." (R. 82). Eventually when he exhausted his financial resources, he was

desperate and thus applied for benefits. (R. 82).

**B. Mr. Wright's Mental Health History**

The medical evidence reflects years of intensive mental health treatment,

including in-patient hospitalizations, a constant medication regimen with

significant attention by medical providers to the efficacy of various types and doses

of medication, and individual and group therapy. The records indicate Mr. Wright

has suffered serious and lengthy bouts of depression and anxiety in his adult life.

He attempted suicide in his late teens. His first sustained mental health

treatment occurred after his life-partner of 12 years died in 2002. (R. 273). At that

6

time, he began taking medications to treat depression, including Paxil.  (R. 273).
In mid-2006, he sought help because of increased "intense feelings of depression
and anxiety" that had been building up for about four months and were causing
symptoms of decompensation (R. 262).  He was not functioning well, was
unmotivated and lethargic, was feeling hopeless and worthless, and was on the
verge of losing his job, which he soon did.  (R. 262-273).  At some point Mr. Wright
was able to return to working, before he then quit altogether in July 2007.

In January 2008, he was admitted as an inpatient in an Indianapolis
hospital for psychiatric treatment.  (R. 283).  He reported a six-year history of
depression following the death of his partner, and that his depression had
worsened in the last six months following treatment for some physical medical
issues.  Mr. Wright's thoughts of suicide had become more intense and included
plans, leading to a three-day hospitalization.  (R. 283).  His psychiatric medications
for depression and anxiety were adjusted (by weaning off two medications, adding
a different medication, and decreasing the dosage of a third medication).  (R. 283).
The in-patient treatment and changes in medication worked to dramatically
improve Mr. Wright's mental status as compared to his pre-admission crisis, and
his mood improved and anxiety decreased.  (R. 291).

Mr. Wright then moved to Muncie in 2008 and began treatment with a
mental health services provider in the Muncie area.  He attended five or six
individual therapy sessions in November and December 2008 and continued to
receive psychiatric medications and the management of those medications at this

provider.  The record shows Mr. Wright was seen for medication management and mental health status reviews throughout 2009 and until about July 2010 from this provider.  (*See* R. 374-296).  He regularly reported problems with depression, anxiety, and panic attacks.  (*Id.*).  In July 2010, he became unhappy with the medication services being provided (he believed that a drug that was helpful had not properly been refilled), and Mr. Wright asked his primary care provider to take over treatment for his mental health problems.

His primary care provider did so, and prescribed various medications over time to treat Mr. Wright's depression and anxiety.  Medications were replaced and dosages adjusted at various times as Mr. Wright's symptoms seemed to improve or to deteriorate.  (*See* R. 456-459).  In late 2011, Mr. Wright's insurance no longer covered services by his primary care physician.  (R. 444).  When the medications prescribed by his physician ran out, Mr. Wright returned to the Muncie provider (Meridian Services) in April 2012 to reestablish care for depression and anxiety. Mr. Wright began seeing psychiatrist Arman Siddiqui in June 2012, who monitored his mental health symptoms and psychiatric medication regimen and who referred him for individual psychotherapy within Meridian Services.  (R. 251-52).  Between June 2012 and April 2013, Mr. Wright saw Dr. Siddiqui about eight times.  (R. 251, 579, 570, 568, 563, 557, 532).  Dr. Siddiqui then left that practice, and Mr. Wright began seeing psychiatrist Hector Diez, whom he saw three times between July and November 2013.  (R. 517, 621-22, 599-600).

In September 2012, while Mr. Wright was under Dr. Siddiqui's care, he experienced another psychiatric inpatient hospitalization. He had suicidal thoughts and a plan, and when he reached out to Meridian Services, he was taken by ambulance for inpatient treatment for five days. (R. 488). Following this hospitalization, Mr. Wright began intensive psychotherapy at Meridian Services. He had numerous one-hour psychotherapy sessions with Laura Crosby, a licensed mental health counselor: at least 25 sessions over 2012 and 2013. He also participated in group psychotherapy sessions run by Ms. Crosby, beginning in February 2013, generally attending these group sessions weekly. The records indicate Mr. Wright participated in at least 35 group sessions between February and December 2013. As noted, throughout this time, Mr. Wright also saw psychiatrists at Meridian Services on a regular basis, whose care primarily included mental health reviews, risk assessments, and medication management and control.

### C. Mental Health Evaluations by the SSA

Mr. Wright's mental health status was also evaluated at the request of the Social Security Administration and reviewed by a state agency psychologist. He had a one-time, two hour, psychological consultative exam by Susan Crum in early February 2012, shortly after he applied for benefits. She found that his symptoms were consistent with chronic depression despite a significant medication regime. At this time, Mr. Wright's psychiatric care and medication regimen were provided

by his primary care physician.  Dr. Crum recommended that Mr. Wright consult

with a psychiatrist and begin cognitive behavioral therapy.  (R. 439).

A state agency reviewer (psychologist B. Lee Hudson) completed a

"Disability Determination Explanation," dated March 16, 2012.  He reviewed the

evidence that was then available in the file; that evidence did not include records

from Meridian Services or from Wishard Hospital (where Mr. Wright had been

hospitalized in January 2008).  (R. 94).  Dr. Hudson concluded Mr. Wright's mental

impairments were not of listing level severity, but his impairments pose moderate

limitations with interacting with the public and limit his ability to sustain

concentration and persistence.  He found Mr. Wright is moderately limited in his

ability to maintain attention and concentration for extended periods, and

moderately limited in his ability to perform activities within a schedule, maintain

regular attendance, and be punctual within customary tolerances.  (R. 98).  Dr.

Hudson also explained that while the evidence available to him did not "support

severe CPP limitations, discrete episodes of moderate CPP limitations are

expected."  (R. 95).

Dr. Hudson reached these conclusions, even though he was not aware of Mr.

Wright's 2012 psychiatric in-patient hospitalization (it had not yet occurred), and

even though he erroneously believed that the 2008 hospitalization had followed on

the heels of the death of Mr. Wright's long-term partner.  Dr. Hudson wrote that,

"There was one brief psychiatric hospitalization in early 2008 after c/o s/i and plan

[complaints of suicidal ideation and plan].  This was shortly after death of long-

10

term partner." (R. 95).   That death had occurred in 2002, six years before the 2008

hospitalization.  Dr. Hudson also was not aware of Mr. Wright's anxiety diagnosis,

which was formally diagnosed by Dr. Siddiqui in 2012.  And thus his statement

that "there is no evidence of a secondary anxiety dx," while true at the time of Dr.

Hudson's review, was not true once Mr. Wright began receiving regular psychiatric

care in 2012.

   A state agency reviewer (psychologist Donna Unversaw) signed a statement

on April 27, 2012, that she had "reviewed all the evidence in file and the

assessment of 3/16/12 [Dr. Hudson's assessment] is affirmed, as written."  Dr.

Unversaw provided no analysis and did not list the evidence in the file she

reviewed.  It is not known whether any records from Wishard Hospital or Meridian

Services were reviewed at this point.  But given the date of Dr. Unversaw's

statement, she could not have reviewed the lengthy medical records from Mr.

Wright's treatment by psychiatrists Siddiqui and Diaz, his in-patient

hospitalization in July 2012, or the scores of psychotherapy treatment reports at

Meridian Services in 2012 and 2013.

### D. Treating Physician Opinions

   The record before the ALJ contains two completed

"Psychiatric/Psychological Impairment Questionnaires."[2]   The first one is dated

---

[2]     A third completed questionnaire is also in the record. (R. 646-650).  It is
signed by Dr. Diaz, but is dated August 18, 2014, *after* the ALJ issued his decision.
It therefore cannot serve as a basis for reversing the decision.  It can, however, be
evaluated on remand.

February 4, 2013, was filled out by Laura Crosby (the licensed mental health counselor at Meridian Services with whom Mr. Wright had frequent and regular individual counseling and group counseling) and reviewed and signed by Dr. Siddiqui.  (R. 480-487). The second one, dated September 30, 2013, was completed and signed by Ms. Crosby.  (R. 586-593).  These documents rate the severity of Mr. Wright's limitations with respect to numerous work-related factors, including with respect to CPP and state, among other things, that Mr. Wright's CPP is markedly limited and that he can be expected to miss work more than three times per month because of his mental impairments or treatment.

With this background, the court now turns to the ALJ's analysis of Mr. Wright's impairments, and Mr. Wright's assertions of error.

## II.    The ALJ concluded Mr. Wright was not disabled at both steps four and five.

At step one, the ALJ found Mr. Wright had not worked since his alleged onset date.  At step two, he identified major depressive disorder and anxiety disorder as severe mental impairments,[3] and at step three found that no listing was met.  For the RFC, the ALJ accommodated Mr. Wright's mental impairments by a limitation to work tasks at "at GED Reasoning Level 03 (as defined in the Dictionary of Occupational Titles)" and inconsequential or superficial contact with the general public.  (R. 38).  With this RFC, and based on the testimony of a

---

[3]      He also stated that "degenerative joint disease of the right knee status post surgery" was a severe impairment.  (R. 33).  Mr. Wright does not assert any errors in the ALJ's evaluation of his right knee impairment.

vocational expert, the ALJ determined at step four, and, alternatively at step five, that Mr. Wright is not disabled.  At step four, he decided Mr. Wright could work as a car salesman or as a quality assurance inspector.[4]  Alternatively and based on the RFC and the VE's opinion, the ALJ determined Mr. Wright is capable of the demands of the following types of jobs and they exist in significant numbers in the relevant economy:  packager, laundry bundler, and dishwasher.  (R. 43).

## III.   **The ALJ did not properly evaluate the treating physician's opinion.**

Mr. Wright first attacks the ALJ's failure to evaluate properly the opinions of his treating providers.  The ALJ decided that the opinion by Dr. Siddigui (Mr. Wright's treating psychiatrist) had "little weight" for three reasons: (1) an RFC determination is not a medical issue but an administrative finding reserved to the Commissioner, and therefore has no controlling weight or weight of any "special significance"; (2) it was only "countersigned" by Dr. Siddiqui and filled out by Ms. Crosby, who is not a doctor, and thus Dr. Siddiqui did not "add" his own independent professional judgment to the opinion; and (3) treatment notes from

---

[4]     The Commissioner does not specifically address the step four finding.  The step four finding is inconsistent with the VE's testimony, at least with respect to the car salesman job.  One cannot work as a car salesman (or any kind of salesman) if one may have only inconsequential or superficial contact with the public.  As to the quality assurance job, which requires great attention to detail, the court wonders how it possibly could be appropriate for a person who, in the opinion of the state agency reviewing persons, is expected to have discrete episodes of moderate limitations in concentration, persistence, or pace, and is moderately limited in his ability to maintain attention and concentration for extended periods. As addressed later, the VE was not told Mr. Wright had any CPP limitations.  The court will address the ALJ's analysis of Mr. Wright's CPP limitations; they affect all of the jobs described by the VE, and thus disability at both step four and step five.

September 2012 to April 2013  do not support the "exceptional" functional limitations and do not contain "severe symptomatology and significant mental status abnormalities to support the "extreme" opinions." (R. 40-41).

The ALJ did not decide what weight the questionnaire completed by Ms. Crosby alone in September 2013 was entitled to.  The ALJ addressed only two facets of that questionnaire:  the opinion Mr. Wright has moderate limitations in social functioning, which the ALJ agreed was supported by the overall record and the opinion that Mr. Wright is markedly limited in CPP, which the ALJ found "not credible."  The ALJ determined there was "nothing" in the treatment notes to support an "exceptional," marked functional limitation in CPP, and he noted that Mr. Wright was able to "focus" on his personal issues and those of others when he was in group therapy.

The ALJ's reasons for rejecting the opinions of Dr. Siddiqui and Ms. Crosby are inconsistent with governing law and the administrative record.  The court focuses on the ALJ's analysis of Dr. Siddiqui's opinion because he was the treating physician.

First, although "controlling" weight is never assigned to a treating physician's opinion about a claimant's RFC because "the final responsibility for deciding [this] issue is reserved to the Commissioner" (20 C.F.R. 404.1527(d)(2)), it is not true that a treating physician's opinion about a claimant's work capacity is not entitled to any "special significance."  When a treating physician's opinion does not deserve controlling weight, there must be a determination of the weight it

14

deserves (which can be significant) based on a list of factors SSA regulations provide to guide that evaluation. The same factors guide the weighing of all medical opinions, including those of state agency physicians and other medical sources.  The factors are the degree to which the opinion (a) is supported by relevant evidence and explanations; (b) considered all pertinent evidence, (c) is consistent with the record as a whole; and (d) is supported or contradicted by other factors, such as the medical source's understanding of SSA disability requirements. 20 C.F.R. 404.1527(c)(3), (4), (6).  The medical source's field of specialty and the nature and extent of his or her treatment relationship with the claimant are also considered.  *Id.,* 404.1527(c)(1), (2), (5).

Second, there seems no basis for the ALJ's conclusion that Dr. Siddiqui did not bring his independent professional judgment to bear in reviewing and approving as his own the opinions set forth in the February 2013 questionnaire, which include an opinion that Mr. Wright is markedly limited in CPP and in completing a normal work week.  Multiple portions of the opinion reflect Dr. Siddiqui's own diagnoses and prognoses.  He diagnosed major depressive disorder, recurrent, severe without psychotic features and he diagnosed an anxiety disorder. His consistently reported Mr. Wright's prognosis at "Acuity Level: 3-Guarded." *E.g.,* R. 563.  He was aware that Mr. Wright's mental impairments had resulted in two hospitalizations.  He had prescribed an intensive drug regimen to treat the depression and anxiety and continually monitored Mr. Wright regarding his response to the drug regimen (types and dosages).   Dr. Siddiqui saw Mr. Wright on

15

a regular and frequent basis, and he is the one who referred Mr. Wright to Ms. Crosby for intensive individual psychotherapy sessions.  The lists of symptomology shown on the questionnaire are consistent with detailed notes from those psychotherapy sessions.  There seems no reason to assume Dr. Siddiqui was ignorant of the reports and analyses contained in Ms. Crosby's contemporaneous notes, given his role as the treating psychiatrist.

Third, it is not true that the treatment notes prepared by Dr. Siddiqui and Ms. Crosby do not contain "severe symptomatology and significant mental status abnormalities."[5]  Those notes are replete with detailed descriptions supporting the "primary symptoms" listed on the questionnaire:  "depression, sadness, anhedonia, bouts of suicidality, rumination, problems with self-esteem and guilt, avoidance behavior, social isolation, anxiety, excessive worrying."  Further, the "marked" limitations in work capabilities shown on the questionnaire are consistent with Mr. Wright's consistent descriptions of the problems he faces in everyday life because of his depression and anxiety.

Instead of Dr. Siddiqui's opinion about Mr. Wright's work capacity, the ALJ decided that opinions of the state agency psychologists were entitled to the most weight—and significant weight, at that.  Even though these psychologists got their facts wrong in material respects (believing Mr. Wright's decompensation in 2008

---

[5]      It is not clear what the ALJ meant by "mental status abnormalities."  Mr. Wright's mental health impairments do not make him psychotic or less intelligent. His limitations stem from severe depression and anxiety, and the severity of the symptoms of those impairments is well-established by the record.

16

was due to the recent loss of his life partner, even though the death had occurred six years before and being unaware of Mr. Wright's anxiety diagnosis) and did not have the benefit of reviewing at least 18 months of medical records evidencing another inpatient hospitalization and intensive psychiatry and psychotherapy treatment, they opined (in March 2012 and in April 2012) that Mr. Wright's mental impairments do cause and are expected to cause limitations in sustaining concentration and persistence.  They said he was moderately limited (not markedly) in the ability to maintain attention and concentration for extended periods and in the ability to perform within a schedule, maintain regular attention, and be punctual within customary tolerances. R. 95.

The ALJ did not provide good reasons for choosing the "moderate" limitations expressed by state agency physicians, who never met with Mr. Wright and did not review his extensive treatment history, over the marked limitations expressed by Dr. Siddiqui, a psychiatrist with a long treating relationship with Mr. Wright.  As the Seventh Circuit has noted, when an ALJ rejects the opinions from an examining source in favor of findings from a non-examining source, it causes "a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin,* 758 F.3d 834, 839 (7th Cir. 2014) (addressing an ALJ's rejection of the opinion of a state agency physician who examined the claimant in favor of the opinion of a state agency reviewer who did not).  The ALJ's explanations do not pass muster in this case.

IV. **The ALJ's adverse credibility determination is patently wrong.**

Mr. Wright also contends the ALJ's reasons for discounting his credibility do not withstand scrutiny. The court agrees. Although the court gives special deference to an ALJ's assessment of a claimant's credibility, that assessment must still have reasoned underlying support. *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008).

The ALJ's credibility analysis is boilerplate, and provides no true insight into the ALJ's reasoning. He stated that "two factors" weighed against considering Mr. Wright's allegations of the limiting effects of his impairments "to be strong evidence in favor of finding the claimant's functioning to be severely limited":

> First, allegedly limited daily living activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily living activities are as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are outweighed by the other factors discussed in this decision.

This is boilerplate. The court has seen this same phrasing in many ALJ disability decisions and it provides no useful guide to the path of the ALJ's reasoning. *See Moore v. Colvin,* 743 F.3d 1118, 1125-26 (7th Cir. 2014) (criticizing this phraseology). The court does not understand what the ALJ envisions as "objective" verification of a person's daily living activities. Mr. Wright's reports of his daily living activities, including the accomplishments and struggles, are well-documented in his mental health treatment records. The court cannot determine what "other factors" in the decision detract from Mr. Wright's reports. Again, there

18

are a multitude of records covering years and years of mental health treatment that are consistent with Mr. Wright's reports of the difficulties he has faced in living with his severe depression and anxiety.  He has had many episodes of complete decompensation; he has been hospitalized twice; he struggles to force himself to engage in worthwhile activities; and he can hit a good patch, even for months at a time (describing a one month period in September 2010, in which he was able to get up and out of his house on all but two days), but his anxiety and depression levels are always high.

The Commissioner contends there are snippets elsewhere in the ALJ's opinion that shed better light on the credibility determination, but many of the ALJ's commentary in those snippets either lack support or the ALJ did not suggest they undermined Mr. Wright's descriptions of how his depression and anxiety affect him on a sustained basis.  For example, the Commissioner states that Mr. Wright had a gap in his treatment from February 2010 to July 2012.  But that's not true.  For most of this time period, Mr. Wright turned to his personal care physician to prescribe the appropriate medications to treat his depression and anxiety, and was regularly under that doctor's care to manage his psychiatric medications.  He had stopped therapy sessions in this time frame, but explained why he had become disenchanted with the therapy he was receiving.  *See* R. 434 (explaining that he had not pursued mental health counseling for a time because he was "always being passed off to a graduate student . . . a first or second year Master's student and it seemed more for their benefit than mine.")  He had not

19

stopped treatment for his mental impairments.  The Commissioner also notes that the consultative psychologist stated that despite Mr. Wright's complaints with concentration and problem solving, there was no indication of "cognitive difficulties that would impede" employment.  But neither Mr. Wright nor any of his treatment providers have ever suggested that Mr. Wright lacks intelligence.

When the treatment record is as extensive as Mr. Wright's and his complaints of the limiting effects of his impairments are as consistent over time as Mr. Wrights are, and are consistent with the intensity of his treatment, the ALJ's boilerplate credibility analysis is woefully deficient.  The court is convinced it is patently wrong.

## V.   **The ALJ failed to accommodate Mr. Wright's CPP limitations.**

Despite the fact the ALJ found that Mr. Wright has moderate difficulties in concentration, persistence, or pace, he did not include any restrictions in his hypothetical to the VE to account for the moderate difficulties.  As the Seventh Circuit has held time and again, a VE must be informed of a claimant's particular deficiencies in concentration, persistence, or pace, or at very least there must be some rational tie between a claimant's particular deficiencies and the limitations contained in the RFC and communicated to the VE.  *See, e.g., Varga v. Colvin,* 794 F.3d 809, 814-16 (7th Cir. 2015); *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618-21 (7th Cir. 2010).

The ALJ's RFC lacks the requisite connection between Mr. Wright's moderate limitations and the functional capacity used in the hypothetical to the

VE.  The ALJ found, in his opinion, that Mr. Wright's impairments "interfere with his ability to sustain focused attention and concentration to the extent they hinder him from the timely completion of tasks commonly found in work settings."  R. 37. He also gave significant weight to opinions of the reviewing psychologists who stated:

- Mr. Wright does not have severe CPP limitations, but discrete episodes of moderate CPP limitations are expected.

- Mr. Wright has limitations in sustained concentration and persistence.

- Mr. Wright's ability to maintain attention and concentration for extended periods is moderately limited.

- Mr. Wright's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is moderately limited.

(R. 95, 98).

To address these functional difficulties, the ALJ limited Mr. Wright to work that is at GED Reasoning Level 03 as defined in the Dictionary of Occupational Titles.  The characteristics of Reasoning Level 03 do not measure a person's attention and concentration spans or ability to regularly show up for work and on time.  It is a measurement of general intellectual cognition skills, skills that no one doubts Mr. Wright has.  He does not lack intelligence.  His mental health records reflect, instead, that his severe depression and anxiety prevent him from

consistently attending to, concentrating on, and completing tasks, even very simple ones.  As described in the DOT, Reasoning Level 03 means the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, [and] [d]eal with problems involving several concrete variables in or from standardized situations."  In this case, there is no reasoned path from the source of Mr. Wright's CPP deficits and the only accommodation (Reasoning Level 03) the ALJ provided in his RFC and hypothetical question.  This significant and material flaw in the ALJ's analysis requires remand.

**Conclusion**

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND the Commissioner's decision under sentence four.  Any objections to this Report and Recommendation must be filed in accordance with 28 § U.S.C. 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Date:  August 30, 2016

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system